**In re: WILLIAMS SECURITIES LITIGATION**

**This Document Relates to: WCG Subclass**

**No. 02–CV–72–H(M).**

United States District Court, N.D. Oklahoma.

Dec. 12, 2003.

James Rouse Hicks, Ronald Joseph Saffa, Morrel West Saffa Craige & Hicks Inc, Tulsa, OK, Kevin J Yourman, Behram V Parekh, Weiss & Yourman, Los Angeles, CA, Steven G Schulman, Samuel H Rudman, U Seth Ottensoser, Caroline L Marshall, Jennifer K Hirsh, Joshua H Vinik, Dael Cohen, Milberg Weiss Bershad & Schulman LLP, New York, NY, Nadeem Faruqi, Faruqi & Faruqi, New York, NY, David Scott, Neil Rothstein, Michael Swick, Scott & Scott, Colchester, CT, Sherrie R Savett, Michael T Fantini, Berger & Montague PC, Philadelphia, PA, William B Federman, Federman & Sherwood, Oklahoma City, Seth D Rigrodsky, Milberg Weiss Bershad & Schulman LLP, New York, NY, Mark C Gardy, Abbey Gardy LLP, New York, NY, Fred Taylor Isquith, Gregory Mark Nespole, Jeffrey G Smith, David L Wales, Wolf Haldenstein Adler Freeman & Herz, New York, NY, Marc S Henzel, Marc S Henzel Law Office, Bala Cynwyd, PA, Brian M Felgoise, Jenkingtown, PA, Ira M Press, Kirby McInerney & Squire, New York, NY, R Robyn Assaf, Jones Kurth Andrew & Ortiz, Oklahoma City, OK, William W Thomas, Michael I Behn, Futterman & Howard Chtd, Chicago, IL, Mel E Lifshitz, Gregory M Egleston, Bernstein Liebhard & Lifshitz LLP, New York, NY, Michael D Braun, Stull Stull & Brody, Los Angeles, CA, Marc A Topaz, Schiffrin & Barroway LLP, Bala Cynwyd, PA, Paul J Geller, Cauley Geller Bowman & Coates LLP, Boca Raton, FL, Jeffrey H Squire, Mark A Strauss, Kirby McInerney & Squire, New York, NY, R. Robyn Assaf, Jones Kurth Andrew & Ortiz, Oklahoma City, OK, Charles J Piven, Baltimore, MD, Robert I Harwood, Samuel K Rosen, Wechsler Harwood Halebian & Feffer LLP, New York, NY, Andrew M Schatz, Jeffrey S Nobel, Patrick A Klingman, Wayne T Boulton, Schatz & Nobel PC, Hartford, CT, Robert M Roseman, John Macoretta, Spector Roseman & Kodroff PC, Philadelphia, PA, John G Emerson, Jr, Emerson Poynter LLP, Little Rock, AR, Jeffrey C Zwerling, Richard A Speirs, Zwerling Schachter & Zwerling LLP, New York, NY, Brian Barry, Jill Levine, Los Angeles, CA, Susan R Gross, Bernard M Gross PC Law Offices, Philadelphia, PA, Richard A Lockridge, Karen M Hanson, Lockridge Grindal Nauen PLLP, Minneapolis, MN, John R Malkinson, Malkinson & Halpern PC, Chicago, IL, Michael D Donovan, Donovan Searles LLC, Philadelphia, PA, Paul J Scarlato, Weinstein Kitchenoff Scarlato & Goldman Ltd, Philadelphia, PA, Evan Smith, Bala Cynwyd, PA, Burton H Finkelstein, Andrew J Morganti, Finkelstein Thompson & Loughran, Washington, DC, Joshua M Lifshitz, Peter D Bull, Bull & Lifshitz LLP, New York, NY, Charles Robert Burton, IV, R Thomas Seymour, Seymour Law Firm, Tulsa, OK, Christopher Lometti, Ashley Kim, Schoengold & Sporn PC, New York, NY, Jonathan M Plasse, Emily C Komlossy, Lynda J Grant, Goodkind Labaton Rudoff & Sucharow LLP, New York, NY, Jules Brody, Aaron Brody, Tzivia Brody, Stull Stull & Brody, New York, NY, David B Kahn, Mark E King, David B Kahn & Associates Ltd, Northfield, IL, Jerold B Hoffman, Hoffman & Edelson LLC, Doylestown, PA, Thomas G Shapiro, Shapiro Haber & Urmy LLP, Boston, MA, Gerald Joseph

Lovoi, Tulsa, OK, Marvin L Frank, Eric J Belfi, Murray Frank & Sailer LLP, New York, NY, Kenneth A Elan, New York, NY, Michael G Lange, Steven Morris, Berman DeValerio Pease Tabacco Burt & Pucillo, Boston, MA, for Victor Cali, Individually And On Behalf of All Others Similarly Situated 02–C–72–H(M), Thomas Ingoglia, Individually And On Behalf of All Others Similarly Situated 02–C–72–H(M), All Plaintiffs, Blaine J Watkins, bond purchaser class member 02–C–218–H(M), Market Street Securities, Inc., class member 02–C–132–H(M), Local 710 Pension Fund, debt securities subclass member, George Chidlae Weisz, 02–C–77–H, Harvey Matcovsky, 02–C–78–H, Gloria Rein, 02–C–78–H, Jay Hansbro, 02–C–80–H, Robert A Rovner, 02–C–81–H, Thomas W Clavin, 02–C–83–H, Malka Berger, 02–C–93–H, Todd Simon, 02–C–93–H, BC Investment Club, 02–C–95–H, Jeffrey Cohen, 02–C–107–H, Dale N Shook, 02–C–113–H, Harriet Goldstein, 02–C–120–H, Angelo Armezzani, 02–C–124–H, Joyce Armezzani, 02–C–124–H, John Cottrell, 02–C–130–H, John Querci, TTEE Medical Walk in Ctr PS Plan DTD 01/01/92, 02–C–135–H, Michael Ackerman, 02–C–139–H, Michael Sheniak, 02–C–161–H, Paul W Miller, 02–C–162–H, Saffi Omar, 02–C–184–H, Ronald Wilkinson, 02–C–189–H, Sarah Harman, 02–C–204–H, Teamsters Local 854 Pension Fund, 02–C–205–H, Health & Welfare Benefits Plan Fund, Local 854 I.B.T., 02–C–205–H, Elaine Katz, 02–C–206–H, Diana Vaughan, 02–C–231–H, Lawrence M Cohen, 02–C–235–H, Lawrence M. Cohen Trust, 02–C–235–H, Lawrence M. Cohen Ira, 02–C–235–H, Leon Kaufman, 02–C–235–H, Leon Kaufman Ira, 02–C–235–H, Malvin Kaufman, 02–C–235–H, Malvin Kaufman Ira, 02–C–235–H, Scott Kaufman Ira, 02–C–235–H, Local 710 Health and Welfare Fund, Amy K Hoffman, Jeffrey S Jordan, Gary Kosseff, plaintiffs.

Graydon Dean Luthey, Jr, Sarah Jane McKinney, Hall Estill Hardwick Gable Golden & Nelson, Tulsa, OK, Alex Anton Goldberg, Williams Companies Inc, Tulsa, OK, Timothy K Roake, Sally J Berens, Courtney Greene Power, Gibson Dunn & Crutcher, Los Angeles, CA, Steven J Rothschild, Scott L Adkins, Randolph K Herndon, Skadden Arps Slate Meagher & Flom, Wilmington, DE, Wayne W Smith, Meryl L Young, Jeffrey H Reeves, Darren L McCarty, Ethan D Dettmer, Gibson Dunn & Crutcher LLP, Irvine, CA, Michael James Gibbens, James L Kincaid, Victor Eric Morgan, Gerald Lee Jackson, Crowe & Dunlevy, Tulsa, OK, Susan E Huntsman, Crowe & Dunlevy, Tulsa, OK, Jennifer Ann Blankenship, Crowe & Dunlevy, Oklahoma, City, OK, Timothy James Bomhoff, Patrick M Ryan, Phillip G Whaley, Ryan & Whaley, Oklahoma City, OK, Joe M Hampton, Oklahoma City, OK, Miles N Ruthberg, Jamie L Wine, Paul V Konovalov, Latham & Watkins, Los Angeles, CA, Burck Bailey, Warren F Bickford, IV, Brooks A Richardson, Fellers Snider Blankenship, Bailey & Tippens, Oklahoma City, OK, Dennis J Block, Jonathan M Hoff, Alla Lerner, Isaac Greaney, Cadwalader Wickersham & Taft, New York, NY, Jennifer Ellen Mustain, Hall Estill Hardwick Gable, Golden & Nelson, Tulsa, OK, John Barnes Heatly, Fellers Snider Blankenship, Bailey & Tippens, Oklahoma City, OK, Vance L Beagles, Ralph I Miller, Weil Gotshal & Manges LLP, Dallas, TX, for Williams Companies, Inc., the, Sued as: Williams Companies, Inc., separately and senior management, Williams Communications Group, Inc., Keith E Bailey, Howard E Janzen, Scott E Schubert, Ken Kinnear, Matthew W Bross, Bob F McCoy, Howard S Kalika, John C Bumgarner, Frank M Semple, Ernst & Young, LLP, Goldman Sachs & Co., UBS Warburg LLC, Williams Defendants, Underwriter Defen-

dants, All Defendants, Steven J Malcolm, 02–C–206–H, Gary R Belitz, Hugh M Chapman, Glenn A Cox, Thomas H Cruikshank, William E Green,. W R Howell, James C Lewis, Charles M Lillis, George A Lorch, Jack D McCarthy, Gordon R Parker, Janice D Stoney, Joseph H Williams, Lehman Brothers Inc., sued as: Lehman Brothers, Merrill Lynch & Co., Salomon Smith Barney, Inc., sued as: Salomon Smith Barney, Banc of America Securities LLC, Barclays Capital, BNP Paribas, Commerzbank Capital Markets Corp, Credit Lyonnais Securities (USA) Inc., Fleet Securities, Inc., KBC Financial Products, RBC Dominion Securities Corporation, Scotia Capital (USA) Inc., Suntrust Robinson Humphrey, TD Securities (USA) Inc., Williams Capital Group, L.P., Ira D Hall, Frank T MacInnis, Steven J Malcolm, Credit Suisse First Boston Corporation, Mizuho International PLC, ABN Amro Rothschild LLC, BMO Nesbitt Burns Corp, Barclays Bank PLC, CIBC World Markets Corp, RBC Dain Rauscher Inc., Royal Bank of Scotland PLC, the, Merrill Lynch, Pierce, Fenner & Smith, Inc., defendants.

James Rouse Hicks, Ronald Joseph Saffa, Morrel West Saffa Craige & Hicks Inc, Tulsa, OK, Kevin J Yourman, Behram V Parekh, Weiss & Yourman, Los Angeles, CA, Steven G Schulman, Samuel H Rudman, Andrei V Rado, Caroline L Marshall, Jennifer K Hirsh, Joshua H Vinik, Milberg Weiss Bershad & Schulman LLP, New York, NY, Nadeem Faruqi, Faruqi & Faruqi, New York, NY, David Scott, Neil Rothstein, Michael Swick, James E Miller, Scott & Scott, Colchester, CT, Elizabeth P Lin, Weiss & Yourman, Los Angeles, CA, Seth D Rigrodsky, Milberg Weiss Bershad & Schulman LLP, New York, NY, Charles Robert Burton, IV, R Thomas Seymour, Scott A Graham, Seymour Law Firm, Tulsa, OK, Christopher Lometti, Ashley Kim, Schoengold & Sporn PC, New York, NY,

William B Federman, Federman & Sherwood, Oklahoma City, OK, Marc A Topaz, Andrew L Barroway, Stuart L Berman, Schiffrin & Barroway LLP, Bala Cynwyd, PA, Sherrie R Savett, Michael T Fantini, Berger & Montague PC, Philadelphia, PA, Jeffrey C Zwerling, Richard A Speirs, Zwerling Schachter & Zwerling LLP, New York, NY, Richard A Lockridge, Karen M Hanson, Gregory J Myers, Lockridge Grindal Nauen PLLP, Minneapolis, MN, John R Malkinson, Malkinson & Halpern PC, Chicago, IL, Samuel P Sporn, Jay P Saltzman, Schoengold & Sporn PC, New York, NY, for Norman H Kirkendoll, class member, Alex Meruelo, class member, Melis Paronyan, class member, HGK Asset Management, Inc., class member, Jay-Bee Imports, Inc., class member, Douglas E Miller, class member, Carol Moore, class member, Bruce Smith, bond purchaser class member, Kathleen Smith, bond purchaser class member, Bruce Russell, bond purchaser class member, Westmonte Plaza, Inc., class member, Darryl Abramowitz, class member, Subclass of Purchasers of WMB Securities, movants.

### ORDER

HOLMES, Chief Judge.

This matter comes before the Court pursuant to the following motions filed on November 25, 2002:(1) Motion to Dismiss of WCG Defendants and Brief in Support (Docket No. 189); (2) Motion of Williams Defendants to Dismiss the Consolidated Amended Class Action Complaint on Behalf of Purchasers of WCG Securities (Docket No. 196); (3) Defendant, Ernst & Young LLP's, Motion to Dismiss Consolidated Amended Class Action Complaint for Securities Fraud on Behalf of Purchasers of Williams Communications Group, Inc. Securities (Docket No. 198). The Court heard argument on these motions on

April 4, 2003. Based upon a careful review of Consolidated Amended Class Action Complaint for Securities Fraud on Behalf of Purchasers of Williams Communications Group, Inc. Securities (the "Complaint"), the parties' lengthy submissions, and arguments at the hearing, the Court hereby enters the following Findings of Fact and Conclusions of Law:

### Findings of Fact

Based on the pleadings, and solely for the purpose of deciding the instant motions, the Court finds as follows:

1. This action was brought on behalf of purchasers of the publicly-traded equity and debt securities of Williams Communications Group, Inc. ("WCG" or the "Company"), between July 24, 2000 and April 22, 2002 (the "Class Period"). During the Class Period, WCG was a broadband Internet communications provider that purported to own and operate a nationwide fiber-optic network focused on providing voice, data, Internet, and video services to communications services providers. Until midway through the Class Period, WCG was a wholly-owned subsidiary of The Williams Companies ("WMB"), and as such was controlled and dominated by WMB and its executives.

2. The named defendants in the Complaint are the "Individual Defendants,"[1] WMB, and Ernst & Young ("E & Y"), the outside auditor at all relevant times for both WCG and WMB. The Complaint alleges claims against (1) all Defendants under § 10(b) of the Exchange Act of 1934 and Rule 10b–5 promulgated thereunder; and (2) the Individual Defendants and WMB as controlling persons under § 20(a) of the Exchange Act.

3. The Complaint alleges that, immediately prior to the inception of the Class Period, the Board of WMB had been provided with a confidential report by The Boston Consulting Group that described the financial condition of the telecommunications industry as a "train wreck." The Boston Consulting Group report stated in part that substantial equity and debt resources for telecommunications companies were no longer readily available, if at all. According to the Complaint, to avoid having to take substantial writedowns, to unload debt off WMB's balance sheet, to preserve WMB's credit rating, and to take better advantage of energy trading opportunities (which then appeared bright)—and despite the fact that WCG was allegedly undercapitalized—on March 30, 2001, the Board of WMB approved the spin-off of WCG whereby approximately 400 million shares, approximately 95% of WCG, would be distributed to shareholders of WMB as a tax-free special dividend.

4. According to the Complaint, in the midst of the continuing slowdown in the Internet and telecom sectors, Defendants took steps that were designed to reassure the public that WCG was and would remain a viable entity capable of surviving independently from WMB. For example, throughout the Class Period, Defendants issued financial statements asserting that WCG was adequately funded, was not being adversely affected by any over-capacity or over-supply conditions, and was successfully executing on its business plan. According to the Complaint, these actions were intended to provide false reassurance and the statements were false and misleading when made.

5. The Complaint alleges that these statements were materially false and mis-

---

1. Collectively, Keith E. Bailey, Howard E. Janzen, Scott E. Schubert, Ken Kinnear, Matthew W. Bross, Bob F. McCoy, Howard S. Kalika, John C. Bumgarner, Jr., and Frank M. Semple constitute the "Individual Defendants."

leading when made because, among other things: (1) WCG was severely undercapitalized prior to its spin-off, had only a few months of operating capital remaining, and did not have adequate access to new funding; (2) WCG was materially over-leveraged as compared to other companies in its peer group; and (3) WCG was continuously near default on its bank covenants (or was actually in default) because of its deficient balance sheet and operating performance. Furthermore, because WMB had burdened WCG with $7 billion in debt prior to the spin-off, WCG was so over-leveraged that the Company could not obtain necessary credit without WMB acting as its guarantor. At the same time, demand for bandwidth continued to slow and bandwidth pricing deteriorated. At this time, any significant write-down of WCG's assets would have put the Company in violation of the terms of its credit facility covenants for which WCG's assets provided backing. Further, WMB's contingent $1.4 billion financial obligation to WCG—which WMB assumed in connection with a private offering of WCG's debt in 2001—was not properly recognized on WMB's books and WMB did not take proper reserves for this contingency. The debt financing WCG obtained through its private offering was at most a stopgap which did not cure WCG's long-term financing shortfall, although it contributed to a near-term appearance of financial stability.

6. According to the Complaint, during the Class Period and prior to the spin-off, Defendants' financial advisor, Lehman Brothers, confirmed that WCG had a serious funding problem and was in drastic need of additional capital, raising material undisclosed risks as to its ability to continue as a going-concern and to maintain or expand its network. Indeed, in August 2001—four months after the spin-off and unknown to the public—WCG's Board met in an emergency session to discuss WCG's survival and to consider strategic alternatives, including a "forced" recapitalization.

7. The Complaint further alleges that, in the Fall of 2001 and Winter of 2002, despite the fact that WCG's balance sheet was actually impaired and WCG was not in compliance with the covenants in its credit facilities, Defendants continued to falsely portray WCG's financial condition and capital structure by denying that the Company was heading for bankruptcy or otherwise in precarious financial condition. On November 1, 2001, WCG secretly retained Blackstone Group, LP ("Blackstone"), a New York-based financial advisor that specializes in advising companies and creditors in financially distressed situations, including advising debtors, creditors, and other constituents in Chapter 11 proceedings. Nevertheless, according to the Complaint, Defendants continued making materially false and misleading statements in November 2001 and misrepresented WCG's financial strength and ability to execute its business plan.

8. The Compliant further alleges that, throughout the Class Period, in order to conceal WCG's true financial condition, and to avoid defaulting on the Company's credit agreements, Defendants falsely inflated WCG's revenue and balance sheet data for fiscal years 2000 and 2001 by improperly reporting revenue in connection with indefeasible rights of use ("IRU") swap transactions and failing to timely write-down the value of WCG's impaired assets in violation of generally accepted accounting principles ("GAAP"). In particular, Defendants allegedly: (1) improperly reported revenues and earnings before interest, taxes, depreciation, and amortization ("EBITDA") in connection with $2 billion in IRU/swap transactions on WCG's financial statements, when such financial results were not properly recognizable because the transactions served no

legitimate business purpose; (2) improperly concealed material details concerning WCG's IRU/swap transactions in order to report false revenues where GAAP mandated disclosure; and (3) materially overstated WCG's reported earnings by failing to timely write-off approximately $2.9 billion in charges in connection with the impaired value of WCG's excess optronics inventory, Winstar assets, international assets, and excess fiber and conduit.

9. The Complaint alleges that Defendants' false statements and falsely inflated financial results achieved their intended effect, as WCG's stock price was artificially inflated throughout the Class Period and WCG continued to meet the revenue and EBITDA covenants in its credit and bank facilities. These false and misleading financial reports were contained in both WCG's and WMB's Form 10–Ks for the year ending 2000 and WCG's Form 10–Qs disseminated during the Class Period.

10. On April 1, 2002, investors began to learn the true financial and operating condition of WCG, when Defendants announced that WCG was taking a massive impairment charge of $2.9 billion as of the fourth quarter 2001 and would report a net loss of $3.8 billion for fiscal year 2001. For the first time, Defendants publicly acknowledged that WCG was financially insolvent. WCG shortly thereafter filed for bankruptcy. According to the Complaint, by this time, Defendants had positioned WMB to benefit from WCG's bankruptcy and acquire WCG's assets virtually debt-free. Also, according to the Complaint, by this time the Individual Defendants had arranged for their corporate loans to be forgiven in the bankruptcy—a concrete benefit of approximately $13 million to them. By that time, E & Y had received millions of dollars in non-auditing consulting fees, which were several times greater than the fees it received for providing auditing services to both WCG and WMB.

11. WCG's stock began the Class Period trading at $28.50 per share and traded at the end of the Class Period (post-bankruptcy) at approximately five cents per share. The common stock was completely extinguished through WCG's bankruptcy.

### Conclusions of Law

#### I. Introduction

A. *Standard of Review*

1. In ruling on a motion under Fed. R.Civ.P. 12(b)(6), all well-pleaded factual allegations are accepted as true and viewed in the light most favorable to the nonmoving party. *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1257 (10th Cir.2001).

2. The Private Securities Litigation Reform Act of 1995, Pub.L. No. 104–67, 109 Stat. 737, (the "PSLRA") mandates a more stringent pleading standard for securities fraud actions in general, and for scienter allegations in particular. *Id.* at 1258.

3. The PSLRA, therefore, requires the Court to disregard all "catch-all" or "blanket" assertions that do not live up to the particularity requirements of the statute. *In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 741 (8th Cir.2002).

4. Moreover, while all inferences are drawn in Plaintiffs' favor, inferences of scienter must be both reasonable and strong to survive dismissal. *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 827 (8th Cir.2003); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 551 (6th Cir.2001) (*en banc*); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 195–96 (1st Cir.1999).

### B. Elements of a § 10(b) Claim and Rule 10b–5

5. Plaintiffs may not bring suit under Rule 10b–5, 17 C.F.R. § 240.10b–5, for acts not prohibited by the text of Securities Exchange Act of 1934 § 10(b), 15 U.S.C. § 78j(b). *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 173, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

■ 6. Section 10(b) prohibits only manipulation or deception. *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 473–74, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). Manipulation refers to practices that are intended to mislead investors by artificially affecting market activity, *Santa Fe*, 430 U.S. at 476, 97 S.Ct. 1292. Deception involves the making of a material misstatement or omission. *Cent. Bank*, 511 U.S. at 177, 114 S.Ct. 1439. Section 10(b) does not provide a remedy for corporate mismanagement or breach of corporate fiduciary duty, *Santa Fe*, 430 U.S. at 474, 477–79, 97 S.Ct. 1292, and the Court will not allow artful legal draftsmanship to avoid this requirement, *see Panter v. Marshall Field & Co.*, 646 F.2d 271, 289 (7th Cir.1981).

■ 7. In order to state a deception claim under § 10(b) and Rule 10b–5, Plaintiffs must allege that: (1) each Defendant made an untrue statement of material fact or failed to state a material fact; (2) the conduct occurred in connection with the purchase or sale of a security; (3) the Defendant made the statement or omission with scienter; and (4) Plaintiffs relied upon the misrepresentation and sustained damages as a proximate result thereof. *Anixter v. Home–Stake Prod. Co.*, 77 F.3d 1215, 1225 (10th Cir.1996).

### C. Particularity

■ 8. To the extent a Complaint is pled on information and belief, Plaintiffs must: (1) specify each statement alleged to have been misleading; (2) specify the reasons why the statement is misleading; and (3) state with particularity all facts upon which that belief is formed. 15 U.S.C. § 78u–4(b)(1).

■ 9. When relying upon anonymous sources to support a belief stated in the Complaint, Plaintiffs must describe such sources with sufficient particularity to support the probability that a person in the position described would possess the information alleged. *ABC Arbitrage Pls. Group v. Tchuruk*, 291 F.3d 336, 353 (5th Cir.2002); *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir.2000). If such anonymous sources are inadequately described, the belief can only be asserted if other facts, *i.e.*, documentary evidence, provide an adequate basis for the belief. *ABC Arbitrage*, 291 F.3d at 353; *Novak*, 216 F.3d at 314.

### D. Scienter

10. Plaintiffs must, as to each act or omission alleged to violate § 10(b), state with particularity facts giving rise to a strong inference that each Defendant acted with scienter.

■ 11. Scienter is a mental state embracing an intent to deceive, manipulate, or defraud. *Fleming*, 264 F.3d at 1259. Scienter includes (1) intentional misconduct, defined as deliberate illegal behavior; and (2) recklessness, defined as conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or so obvious that he must have been aware of it. *Id.* at 1260.

■ 12. To establish scienter for non-disclosure, Plaintiffs must show that each

Defendant (1)(a) knew of the potentially material fact, and (b) knew that failure to reveal the potentially material fact would likely mislead investors; or (2) knew of a fact that was so obviously material that the Defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors. *Id.* at 1261.

### E. *Motive and Opportunity*

13. The Court must look to the totality of the pleadings to determine whether Plaintiffs' allegations permit a strong inference of fraudulent intent. *Id.* at 1262.

14. In order to show motive, Plaintiffs must assert a concrete and personal benefit to each Defendant resulting from the fraud. *Fleming*, 264 F.3d at 1270; *In re K-tel Intern., Inc. § Lit.*, 300 F.3d at 881, 894 (8th Cir.2002).

### F. *Accounting*

15. Allegations of accounting irregularities or violations of generally accepted accounting principles ("GAAP") or generally accepted auditing standards ("GAAS") are insufficient to state a securities fraud claim, unless coupled with allegations of fact that the violations or irregularities were the result of a fraudulent intent to mislead investors. *Fleming*, 264 F.3d at 1261.

### G. *Materiality*

16. A statement or omission is material only if (1) a reasonable investor would consider it important in determining whether to buy or sell stock; and (2) it would have significantly altered the total mix of information available to current and potential investors. *Id.* at 1265. If an event is contingent or speculative in nature, its materiality depends at any given time on balancing both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity. *Id.* at 1265.

### H. *Puffery*

17. Vague statements of corporate optimism (or puffery) are not materially misleading as a matter of law, as such generalized statements of optimism are not capable of objective verification and reasonable investors do not rely on them in making investment decisions. *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119–20 (10th Cir.1997). The market, rather, relies on facts and not mere expressions of optimism from corporate spokespersons in determining the value of a security and, thus, gives most credence to specific statements of fact. *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir.1993).

### I. *Bespeaks Caution*

18. Because the materiality of a statement depends upon the total mix of information available to the investor, a statement is not material if other documents available to the investing public bespeak caution about the subject matter of the alleged misstatement. *Grossman*, 120 F.3d at 1120. Under this doctrine, forward-looking statements are immaterial when a defendant has provided the public with sufficiently specific risk disclosures or other cautionary statements concerning the subject matter to nullify any potentially misleading effect. *Id.* The touchstone of this inquiry is not whether isolated statements are true but whether the defendant's representations and omissions, considered together and in context, would affect the total mix of information and mislead a reasonable investor. *Halperin v. eBanker Usa.com, Inc.*, 295 F.3d 352, 357 (2d Cir.2002). Under the doctrine, the cautionary statements need not be made in the same document as the alleged misrep-

resentations, and such statements are particularly important where fraud on the market is alleged. *Grossman*, 120 F.3d at 1120, n. 7, 1122–23.

■ 19. While the bespeaks caution doctrine predated the PSLRA and is similar to the statutory safe harbor, the doctrine survived the PSLRA as an independent test of materiality. *See* H.R. Conf. Rep. No. 104–369, at 46 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 745.

### J. Safe Harbor

20. The safe harbor of the PSLRA provides that no defendant shall be liable with respect to any forward-looking statement if and to the extent that:

(A) the forward-looking statement is

    (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

    (ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement

    (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading, or

    (ii) if made by a business entity, was

        (I) made by or with the approval of an executive officer of that entity; and

        (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u–5(c)(1). A plaintiff must plead facts giving rise to a strong inference of such actual knowledge. 15 U.S.C. § 78u–4(b)(2).

■ 21. The safe harbor of the PSLRA provides two primary paths by which a defendant may avoid liability. H.R. Conf. Rep. No. 104–369, at 43. The application of the safe harbor under the "actual knowledge" prong does not depend on the use of cautionary language, and the application under the "cautionary language" prong does not depend upon a defendant's state of mind. H.R. Conf. Rep. No. 104–369, at 47; *Helwig*, 251 F.3d at 554, n. 2; *Theoharous v. Fong*, 256 F.3d 1219, 1224–25, n. 6 (11th Cir.2001); *Greebel*, 194 F.3d at 201.

22. In order to be meaningful, the cautionary language need not mention the factor that ultimately belies the forward-looking statement, nor need it mention all possible factors. H.R. Conf. Rep. No. 104–369, at 44; *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir.1999). Cautionary language is meaningful when it warns investors of risks of a significance similar to that actually realized, *id.*, 182 F.3d at 807, and may incorporate by reference SEC filings, *In re Humphrey Hospitality Trust, Inc. Sec. Litig.*, 219 F.Supp.2d 675, 684 (D.Md.2002).

■ 23. The standards for satisfying the "cautionary language" prong for oral statements is set forth in 15 U.S.C. § 78u–5(c)(2). If Plaintiffs rely on a third-party account of a forward-looking statement, Defendants may take advantage of the "cautionary language" prong, even absent the inclusion of the necessary language in the third party's account. To hold otherwise would be to allow Plaintiffs to eviscerate Congress' intent by relying on third-party accounts outside of the Defendants' control. *In re Tech. Cherns. Sec. Litig.*, No. 98–7334, 2001 WL 543769, at *8 (S.D.Fla. Mar. 20, 2001).

■ 24. The types of statements considered forward looking under the safe

harbor are set forth at 15 U.S.C. § 78u–5(i)(1). Where factors underlying a forward-looking statement include both assumptions and statements of known (or past) fact, the entire list of factors is treated as forward looking. *Harris*, 182 F.3d at 805–07.

### K. *Control Person Liability*

25. To state a prima facie case of control person liability, Plaintiffs must establish (1) a primary violation of the securities laws; and (2) control over the primary violator by the alleged control person. *Fleming*, 264 F.3d at 1270. Control means "the power to direct … the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir.1998) (quoting 17 C.F.R. § 230,-405). Dismissal of a § 20(a) claim "is appropriate when … a plaintiff does not plead any facts from which it can reasonably be inferred the defendant was a control person." *Id.* at 1306.

26. Applying applicable law to the facts alleged in the Complaint, the Court finds that (a) the Complaint adequately satisfies the pleading requirements of Fed.R.Civ.P. 9(b) and the PSLRA, and (b) the alleged

statements are materially false and misleading.

27. The PSLRA requires that a private securities plaintiff "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). A Complaint satisfies the Tenth Circuit's standard for pleading securities fraud if it alleges the who, what, when, where, and why of the alleged misrepresentations, *Grossman*, 120 F.3d at 1124, with reasonably sufficient corroborating facts. *In re Cabletron Systems, Inc.*, 311 F.3d 11, 29–30 (1st Cir.2002). As set forth below, the Court finds that the Complaint has satisfied these requirements.[2]

### II. WCG's Allegedly False and Misleading Financial Statements

28. The Complaint sufficiently alleges that defendants materially misstated WCG's financial results in its press releases and SEC filings for the second, third, and fourth quarters of 2000, year-end 2000,[3] and first three quarters of 2001. *See* ¶¶ 61–64, 67–71, 83–87, 102–05, 116–18, 157, 160, 170, 260. Moreover, the Complaint describes in detail how the alleged accounting irregularities at WCG during the Class Period rendered each of the

---

**2.** Moreover, it is clear that the Complaint satisfies the requirements of Rule 9(b) particularity in light of the fact that courts in the Tenth Circuit recognize the applicability of the group-published information doctrine whereby group-published documents such as annual reports, press releases, and SEC filings are presumed to involve the collective actions of corporate directors or officers. *See CFS–Related Sec. Fraud Litig.*, No. 9–CV–825–K, slip op., at 58–59 (N.D.Okla. Dec. 21, 2001) (recognizing that majority of courts continue to apply group pleading post-PSLRA, and agreeing with majority view); *In re Sprint Corp. Sec. Litig.*, 232 F.Supp.2d 1193 (D.Kan.2002) (applying group pleading to a statement by a Sprint spokesperson); *In re*

*Accelr8 Tech. Corp. Sec. Litig.*, 147 F.Supp.2d 1049, 1054 (D.Colo.2001) (recognizing the applicability of group pleading); *In re Ribozyme Pharmaceuticals, Inc. Sec. Litig.*, 119 F.Supp.2d 1156, 1166 (D.Colo.2000) (applying group pleading to press releases); *Schaffer v. Evolving Systems, Inc.*, 29 F.Supp.2d 1213, 1225 (D.Colo.1998) (finding group-published information doctrine applies to cases governed by the PSLRA).

**3.** Defendant E & Y issued an unqualified "clean" audit opinion which was contained in WCG's and WMB's respective Form 10–Ks for the fiscal year ending in 2000. Both companies report on a calendar year basis.

challenged statements materially false and misleading when made. ¶¶ 157–216.

## A. Swap/IRU Transactions

29. The Complaint alleges that WCG's financial results were materially false and misleading because the Company engaged in improper IRU/swap transactions in violation of GAAP which improperly served to inflate WCG's reported revenue and EBITDA performance without disclosure of that fact. ¶¶ 60(v), 208–209. In this regard, the Complaint alleges that from July 1, 1999 through December 31, 2000, WCG entered into over $2 billion worth of 20–year IRU/swap transactions that had no legitimate business purpose but were entered solely to inflate WCG's financial results, and has identified a series of specific IRU transactions entered into by WCG, including the names of the entities involved, the amounts and the dates of the transactions. *See* ¶¶ 60(v), 194–204. These transactions, which were not accounted for in accordance with GAAP, were engaged in for the purpose of meeting WCG's EBITDA and revenue covenants contained in the Company's bank and loan facilities. Among other things, the swap transactions had the effect of

inflating reported EBITDA because expenditures related to the swap are not recorded as an expense but as a capital expenditure, resulting in depreciation expense in future periods, thus never impacting EBITDA; however, the annualized revenues from these exchanges of capacity were still booked as part of overall earnings, thus inflating EBITDA.

## B. Asset Write-downs

30. In addition to the IRU/swap transactions, the Complaint also sufficiently alleges that WCG's financial results were materially false and misleading because WCG's asset values were overstated by approximately $2.9 billion during the Class Period. The Complaint alleges that WCG should have written down its (a) optronics inventory, (b) international assets, (c) Winstar assets, and (d) dark fiber much earlier than it ultimately did in April 2003, when it took an impairment charge of $2.9 billion for these assets, precipitating the Company's move into bankruptcy. ¶¶ 157–190.[4]

31. *Optronics Inventory.* With regard to the optronics inventory, the Complaint sufficiently alleges that the optronics inventory should have been written down by

---

4. These allegations do not constitute fraud-by-hindsight because the Complaint alleges with specificity the facts then-existing during the Class Period that called for a write-down of these assets. *See, e.g., In re Penn Treaty Am. Corp. Sec. Litig.,* 202 F.Supp.2d 383, 390 (E.D.Pa.2002) (rejecting defendants' fraud-by-hindsight argument where plaintiffs alleged declining trend provided defendants with knowledge that their statements during class period were false and misleading when made). Many of the factors which admittedly caused the write-downs were operative throughout the Class Period, but their impact were not properly reflected.

Further, the fact that WCG's financial results were not restated does not mean that the financial results disseminated during the Class Period were accurate. Indeed, "the

fact that the financial statements ... were not restated does not end [plaintiff's] case ... To hold otherwise would shift to accountants the responsibility that belongs to the courts. It would also allow officers and directors of corporations to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement of the financial results." *Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 83 (1st Cir.2002). *See also, Feiner v. SS&C Tech., Inc.,* 11 F.Supp.2d 204, 209 (D.Conn.1998) ("the fact that [the company] has not elected to restate or reverse its earnings or revenue figures ... does not indicate, much less prove, the accuracy of those figures.") Significantly, because WCG filed for bankruptcy, WCG's financial results were not subject to additional audits which may have mandated a restatement.

at least the first quarter of 2001 because Defendants kept track of the excess optronics inventory through computer tracking, and knew or recklessly disregarded that the carrying amount of WCG's optronics inventory was materially overstated and needed to be written down. ¶ 87(a). The Complaint alleges that, in late 2000 and early 2001, eyewitnesses observed excess equipment in WCG's warehouses that was not assigned to any particular job site and that was not needed. ¶¶ 87(b), (c), (d)(i)-(vi). Moreover, by December 2000, because WCG's routes were 90% completed and WCG was in the process of winding down installation operations and the backbone of the network was almost in place, there was no reason why WCG's warehouses were heavily stocked with equipment. ¶ 87(v). Further, even though many telecom companies were taking massive inventory charges during the Class Period due to negative industry trends, including Cisco, which took a $2.25 billion charge in April 2001 for excess inventory, and Nortel Networks, which took a $650 million charge for excess inventory in the quarter ended June 30, 2001—WCG waited until roughly a year later to take similar write-downs based on the same reasons. ¶ 87(d)(ix). The Complaint also alleges that the excessive inventory build-up was due, in substantial part, to "friends and family" deals entered into between various WCG executives and pre-IPO companies whereby WCG purchased unneeded and often technically inferior products from pre-IPO companies so that certain WCG executives, could receive IPO shares and profit thereby when the stock prices increased dramatically in the IPO market. ¶¶ 64(c)(i)-(xii). Defendants' failure to timely write-down these assets violated GAAP because, according to the Complaint, during the first quarter of 2001, the utility of WCG's inventory, "in disposal in the ordinary course of business" was "less than cost" due to negative industry trends (violates ARB 43, Chapt. 4, Statement 5). ¶ 167. In addition, Defendants allegedly had information concerning negative industry trends that rendered it "probable" that the assets were impaired (violates SFAS No. 5), and required writedowns. ¶¶ 167–168.

32. *International Assets.* The Complaint alleges that charges of approximately $256 million for international assets should have been taken beginning in January 2001—over a year prior to WCG's eventual disclosure and prior to the spin-off. ¶¶ 19(b), 118(d). The Complaint alleges that, during the Class Period, Defendants knew or recklessly disregarded events which called for the write-down of millions of dollars of international WCG assets, including that: (a) WCG's partner in its Latin American ventures had completely written-down all of its Latin American assets for the six months ended September 2001; (b) significant negative market changes in the Internet and telecommunications sectors had a materially negative impact on prices for international routes, resulting in a 29% decrease in world-wide bandwidth prices from November 2000 to April 2001 and even more pronounced negative trends in the Latin American space; and (c) other telecommunications companies had announced bankruptcy. ¶ 118(d), 171–177. As pled in the Complaint, GAAP provisions were violated because Defendants failed to write-down WCG's Latin American assets when negative market trends were already forcing WCG's partners in its Latin American ventures to completely write-off these assets and the other factors cited above indicated that the book values of these assets were impaired. *Id.* Thus, there was a "significant ...change in the business climate" that impaired the value of WCG's Latin American assets (vi-

olating SFAS No. 121, ¶ 4–5), and Defendants knew or recklessly disregarded as early as January 2001, that the "economic benefits" of WCG's Latin American assets were "reduced or eliminated" (violating FASB Statement of Concepts No. 5), necessitating material write-downs. ¶¶ 174–177.

33. *Winstar.* The Complaint sufficiently alleges that WCG should have taken a material write-down of its Winstar assets by at least the fourth quarter of 2000 because: (a) WCG had purchased wireless technology from Winstar that it could not and would not ever use, and which Winstar failed to service; (b) there had been significant negative market changes in the Internet and telecommunications sectors; and (c) WCG and Winstar had amended their 1998 agreement for WCG's 25–year indefeasible right to use a percentage of the wireless local capacity of Winstar, which required a reassessment of the Winstar assets by no later than that time. Indeed, by the time WMB spun-off WCG on April 23, 2001, a write-down of the Winstar assets was absolutely necessary because Winstar had announced it had filed for bankruptcy just days before, on April 18, 2001. Nevertheless, in order to assuage fears that the Winstar bankruptcy would affect the Company and to ensure WCG's smooth spin-off, on April 20, 2001, during the five-day period between the Winstar bankruptcy filing and the spin-off, instead of announcing the need for a write-down, Defendants announced that the Winstar bankruptcy would not have a "significant cash impact in 2001" on WCG. ¶ 78. However, pursuant to GAAP, upon the triggering event of Winstar's bankruptcy filing, WCG was required to recognize an impairment loss. ¶¶ 183, 184. WCG's denial of any adverse "cash impact" was itself misleading because it masked, and was intended to divert attention from, its need to record a material write-down. WCG's second and third quarter 10–Qs similarly failed to reflect this write-down. ¶¶ 103, 117.

34. *Dark Fiber.* The Complaint sufficiently alleges specific facts prior to and during the Class Period that signaled the need to take a $1.9 billion charge to WCG's excess fiber and conduit in late 2000 or, at the latest, by early 2001. The Complaint alleges that WCG had lit only two fibers on most of its routes and was reserving hundreds of dark fibers for itself. ¶ 87(e). However, these dark fiber assets were overvalued because of the precipitous decline in the prices of dark fiber during the Class Period, the huge oversupply of available routes, and the ability to meet the market's communications needs on just minimal amounts of fiber. ¶ 87(e). The Complaint alleges that, according to a WCG employee involved with business development, WCG was swapping dark fiber in 1998 and 1999 at $2,000–$3,000 per fiber mile; however, by late 2000 or early 2001, the market for dark fiber "completely vanished." ¶ 87(d). Nevertheless, Defendants knowingly or recklessly failed to timely write down $1.9 billion worth of dark fiber during the Class Period. ¶ 87(c). As pled, this practice violated GAAP provisions because, among other things, Defendants knew and/or recklessly disregarded that the market for dark fiber had virtually disappeared by early 2001 and such negative industry trends constituted "a significant adverse change ... in the business climate" (violating SFAS No. 121, ¶ 4–5), that adversely affected the value of the assets. ¶¶ 187–189. WCG's delaying the write-down until the eve of bankruptcy was unjustified under GAAP and violated its reporting and disclosure requirements.

III. Allegedly False and Misleading Statements Concerning the Reasons for the Spin-off

35. According to the Complaint, to condition the market prior to the spin-off,

Defendants falsely portrayed the spin-off as being highly positive for both WMB and WCG, stating that:

> The spin-off was the best way to ensure that both our energy and communications businesses have the efficient and effective access to the capital necessary to pursue the substantial growth opportunities that each enjoys.

¶ 59, 7/24/00 WMB press release ("PR").

> Our energy and communications businesses have tremendous opportunities before them. Creating the most effective and efficient access to capital will help fuel that growth, and we believe that can best be achieved by creating two independent businesses.

¶ 65, 11/16/00 WMB PR.

> Given our revenue growth, our solid financing plan, our fully operational network and our stable customer base, this spinoff is the natural evolution of a business strategy begun in 1998 ...; We have taken steps to strengthen our balance sheet and fund our long-term business plan; [T]he spinoff gives Williams Communications the best opportunity to strengthen its leadership and the ability to attract investors who value the vast potential of broadband, ... Demand for high-speed bandwidth is growing rapidly ...

¶ 75, WCG PR.

36. As pleaded, Defendants' stated reasons for the spin-off—(a) to provide WCG with "effective and efficient" access to capital, and (b) to allow WCG to realize its growth potential—are sufficiently alleged to have been materially false and misleading when made. In support of this conclusion, the Court notes that the Complaint specifically alleges that Defendants knew and/or were reckless in not knowing that the spin-off would not enable WCG to gain the requisite access to capital because the supply of new capital was unavailable in needed amounts, if at all. Indeed, prior to the spin-off, Lehman Brothers and The Boston Consulting Group both specifically advised Defendants that the capital market for telecom operations and build-out financing had already dried up and that equity and debt resources for telecom companies were no longer available. ¶¶ 9, 58, 66. Further, Defendants were aware that the spin-off was not really to allow WCG to realize its growth potential because the telecom industry was in severe decline. In fact, there existed a vast overcapacity of dark fiber (T8); Defendants were advised by The Boston Consulting Group that the telecom meltdown that was taking place was a "train-wreck" (¶¶ 9, 66(a)); and WCG's business was deteriorating as it was not making high margins on large, established customers, and its high margin business dependent on dot coms was declining as these customers ran low on cash or their business failed (¶ 66(b)). According to the Complaint, contrary to Defendants' stated reasons for the spin-off, the true reason for the spin-off was to enable WMB to remove WCG's mounting losses from its balance sheet, avoid having to take substantial write-downs with respect to WCG, unload WCG's debts off its balance sheet, and to preserve its credit rating so that it could take advantage of the booming opportunities then available in energy trading. ¶¶ 5, 6, 8. Thus, making false and misleading statements concerning the reasons for the spin-off, WMB was able to sell to the public its underperforming and undercapitalized subsidiary and to obtain the necessary consents from lenders and others whose approval was required.

IV. Allegedly False and Misleading Statements Concerning the Company's Business Condition and Prospects

37. The Complaint sufficiently alleges that, throughout the Class Period, both before and after the spin-off of WCG, De-

fendants made numerous false and misleading statements concerning WCG's business condition and prospects. According to the Complaint, even as Defendants recognized that market conditions had deteriorated for telecom companies, they continued to portray WCG as being unaffected by these conditions, downplayed the negative impacts of the market on WCG, and even went so far as to state that WCG was actually benefiting from the market conditions. Defendants allegedly stated, for example:

We have continued to see a dramatic ramp-up in overall industry demand for bandwidth.

¶ 61, 7/27/00 PR.

Williams Communications keeps promising it will ride the crest of the bandwidth market … The company tried to dispel what it called the myth of a coming bandwidth glut … But perhaps most notably, Williams stood firm on what many observers are most concerned about: the health of its balance sheet. "We believe we are on a clear path to profitability," Schubert said. "We have a sound funding strategy in place.' "

¶ 68, 2/15/01 *TheStreet.com* article.

During the course of the first quarter, the company took several important steps to improve its liquidity and strengthen its balance sheet. In a time of constant change and uncertainty in the telecom industry, Williams Communications continues to execute and deliver on its visionary business plan announced in January 1998. Although the current economic environment appears to be weakening, Williams Communications continues to see strong demand for bandwidth services. As capital becomes more difficult to obtain, many bandwidth centric companies are looking to Williams Communications as an alternative to investing heavily into their own network build-outs.

¶ 83, 4/26/01 WCG PR.

It's simply not accurate to add up dark fiber in the ground and then say there's too much capacity … You won't find many industries that can match the growth we're seeing as new broadband applications drive demand. I believe we'll find that marketplace fears about bandwidth glut are unfounded …. It's ironic that the market meltdown has actually created a bigger opportunity for us.

¶ 93, 6/19/01 WCG PR.

"Emerging telecom companies are taking a tremendous beating. It's almost like bodies that have been tripped to the ground and people are walking over those bodies and kicking them," Janzen said. "Well some of those bodies have turned to corpses … and yet some are still very healthy, ready to get up and run. We are certainly in that position."

¶ 98, 6/28/01 *The Daily Oklahoman. See also,* ¶¶ 62, 67 and 92, containing similar statements.

38. The Court finds that these statements are sufficiently alleged to have been materially false and misleading when made. In support thereof, the Court finds the pleading sufficiently alleges that: (a) WCG was experiencing a huge glut of bandwidth capacity along with falling customer demand. ¶ 60(i); (b) by mid or late–2000, WCG was "decommissioning" switches from underutilized POP sites due to the lack of customers. ¶ 60(i); (c) in the third quarter of 2000 alone, WCG lost numerous accounts including Starfone, Connexions, Premier, Urban Media, Compass, and 1/2 of Lightyear's due to technical problems on WCG's network. ¶ 60(iv); (d) WCG's capacity utilization dropped from 60% in first half of 2000 to 40% in the third

quarter of 2000. ¶ 64(d); (e) by the first quarter of 2001, the market was soft, and by the second quarter of 2001, the value for which WCG could sell capacity "dropped by one-half to two-thirds." ¶ 94(a)(i); (f) WCG's sales in Asia for 2000 and 2001 were virtually non-existent, and the only way WCG was able to make its $50 million target in Asia was by entering into a $100 million dark fiber deal with Teleglobe in early May 2001, just weeks before Teleglobe filed for bankruptcy in late May 2001. ¶ 94(a)(ii); (g) WCG's sales in Europe and South America were extremely weak, failing to attain even 10% of its revenue targets. ¶ 94(a)(iii); (h) between January and May 2001, data at weekly Service Delivery meetings showed that customer circuit disconnects were outnumbering new connects, and by June 2001, presentations at the meetings indicated that revenue losses were greater than revenue gains. ¶ 94(a)(iii); (i) by August 2001, not only was the Company not getting any new customers, but 25–50 of WCG's 250 customers were in "workout" mode, trying to renegotiate contracts, including Vartech and Lightyear. ¶ 108(b); and (j) defendant Schubert subsequently admitted that conditions in the financial markets and in the telecom industries had weakened in late 2000 and early 2001. ¶ 151.

39. According to the Complaint, WCG's problems were so pervasive that in August 2001—within four months after WCG's spin-off from WMB in April—WCG's Board had already met and discussed how WCG could "survive" and considered strategic alternatives including a "forced recapitalization." ¶ 108(a). In October, 2001, WCG's largest customer, SBC, which constituted approximately 40% of WCG's revenue, was (unbeknownst to investors) asserting its right to terminate its "alliance" with WCG. ¶ 113. On November 1, 2001, WCG retained Blackstone, a specialist in advising companies in financially distressed situations, including Chapter 11 proceedings. Yet, despite the gravity of WCG's business and financial problems, of which defendants were aware, defendants continued to publicly promote the Company's business conditions and prospects, causing unsuspecting investors to acquire WCG securities at inflated prices. These statements included the following:

Rumor: Williams Communications' business plan is failing.

Fact: With a relentless focus on service delivery and a solid, growing customer base, Williams Communications continues to deliver on its business plan by driving profitable, long-term revenue ... So while others in the industry shift direction looking for the right formula, we've had it all along and continue to deliver.

Rumor: A bandwidth glut threatens to sink the entire telecommunications sector.

Fact: Many people are not differentiating between dark fiber and lit, usable capacity. The vast amounts of fiber in the ground referenced by recent reports will take a great deal of time, capital and expertise to light. So where does that leave Williams Communications? We have a fully lit and operational network capable of addressing market growth rates approaching 100% per year

Rumor: Williams Communications is on the verge of disappearing.

Fact: Williams Communications is here to stay. With funding that takes us into 2004, a plan to be free cash flow-positive by the end of 2003, and the right team and strategy in place, we are positioned to not only survive the current shakeout, but thrive in the years to come.

¶ 106, 8/15/01 Janzen's letter to WCG shareholders.

Williams Communications continues to deliver on its promises; the company has a fully funded business plan, is in compliance with all third quarter covenants and is on track to become operational EBITDA positive by year-end; demand growth is strong and will soon outpace supply as we dig beneath the surface of broadband's potential; bandwidth providers who have fully operational networks—such as Williams Communications—are well positioned to succeed and prosper as demand continues to grow.

¶ 112, 10/4/01 WCG PR.

We continue to perform, drive greater revenue and deliver on our promises. It is with frustration, then, that we hear the news of Standard & Poor's decision to downgrade our publicly-traded debt. While the downgrade is in keeping with Standard & Poor's cautious view of our industry, it has no impact on the cost of our debt. Williams Communications will continue to execute on our plans and differentiate our performance.

¶ 123, 1 /16/02 WCG PR. *See also,* ¶¶ 107, 116, 119, 121, 122, containing similar statements.

40. For purposes of the instant motions, the Court finds that these and similar statements were neither puffery nor immaterial, because they altered the total mix of information available about WCG, *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), and they were known by the speaker at the time expressed to be untrue or without reasonable basis, *Grossman,* 120 F.3d at 1120 n. 6.

41. According to the Complaint, by at least January 2002, Defendants either knew or recklessly disregarded that WCG was heading for bankruptcy. Indeed, on January 18, 2002, the Compensation Committee of WCG's Board approved $13 million in "retention bonuses" to five top WCG executives, including Defendants Janzen, Schubert, Bumgarner and Semple, which was in the form of 20% loan forgiveness per year over five years. Importantly, however, forgiveness was guaranteed and accelerated to immediately forgive the entire amount if WCG filed for bankruptcy. ¶ 135. Moreover, on January 29, 2002, WCG was informed by its bankers that it may be in default of its credit agreements, and, on that same day, WMB announced that it would be delaying the release of its 2001 earnings "pending an internal assessment" of its "contingent obligations" to WCG.[5] Even after these crucial events signaling Defendants' knowledge of impending bankruptcy, Defendants continued to assure investors that all was well with the Company, stating:

"The assessment WMB is undertaking has no direct impact on WCG's operations, WCG's financial performance or the contingent guarantees WMB provided in support of WCG's $750 million network lease agreement (ADP facility) and the $1.4 billion of WCG senior notes issued in March of 2001," Shubert said. "As a company, we remain focused on continued execution and delivering on our commitments."

¶ 127, 1/29/02 WCG PR.

"Although the entire telecom sector is being painted with the same broad brush, Williams Communications continues to differentiate itself by delivering

---

5. According to the Complaint, this disclosure by WMB was materially false and misleading because WMB knew or recklessly disregarded that, by that time, it was all but certain that WMB would have to perform on the guaranty and reflect this liability in its financial results.

superior operational and financial results," said Howard Janzen.

¶ 128, 1/31/02 WCG PR.

Successful execution of the options currently envisioned does not include seeking bankruptcy court protection or the substantial dilution of equity security holders.

¶ 131, 2/4/02 WCG PR.

"Williams Communications does not plan to file for Chapter 11 bankruptcy protection," Janzen said ... "If we are successful with the current plan, it would not involve declaring bankruptcy and it would not involve a significant dilution for equity holders."

¶ 133, 2/4/02 Associated Press.

In 2002, Williams Communications will continue to execute and deliver solid financial results by profitably growing our top-line revenue, strengthening our balance sheet and solidifying our liquidity positions.

¶ 134, 2/13/02 WCG PR. *See also*, ¶¶ 130, containing similar statements.

42. On February 25, 2002, two weeks after the last of these positive statements—and after WCG and WMB privately entered into an agreement whereby WMB arranged for the treatment of its unsecured claims in an manner substantially identical to the claims of the holders of WCG's redeemable notes—WCG publicly disclosed that bankruptcy was under serious consideration. ¶¶ 135, 137. This Court finds that these statements are sufficiently alleged to have been materially false and misleading when made based on Defendants' knowledge and/or reckless disregard of internal adverse facts to the contrary.

### V. Allegedly False and Misleading Statements Concerning WCG's Capitalization

43. The Complaint also sufficiently alleges that, throughout 2001 and into early 2002, Defendants falsely stated that WCG was well-capitalized, was fully funded through 2003 or 2004, was anticipating becoming cash-flow positive, would not have to raise additional capital from outside sources, and was fully able meet all debt covenants and payments. These statements were made repeatedly in various press releases, SEC filings, and published articles. Each of these statements, and the overall image of the Company they conveyed when put together, were material because, as alleged in the Complaint, a major concern in the marketplace with regard to telecommunications companies, since most such companies were still losing money, was whether they had sufficient capitalization to meet their ongoing needs and whether they would continue to meet their payments and debt covenants. In particular, the Complaint alleges the following statements concerning WCG's capitalization:

Closing this transaction [private placement of $1.4 billion in structured notes, which were guaranteed by WMB] enhances our overall liquidity and positions us well in anticipation of the proposed spin-off.

¶ 73, 3/15/01 WCG PR.

[T]hese transactions pre-fund Williams Communications' business plan into 2003, when it anticipates achieving free cash flow.

¶ 83, 4/26/01 WCG PR.

WCG's current financing plan is expected to fund the cash requirements under its current business plan into 2003, when it expects to achieve free cash flow.

¶ 86, 5/10/01 Form 10–Q.

"We absolutely do not have a cash flow problem," Schubert said in answer to speculation about its $7 billion in long-term debt. "With the financing we com-

pleted prior to the spinoff, we have liquidity well into 2003."

¶ 88, 5/25/01 *Tulsa World.*

This level of liquidity is expected to be sufficient to meet all of the company's cash requirements well into 2003 . . . It's unfortunate that the telecom industry is being painted with the same brush, causing our stock and bond prices to be undervalued.

¶ 100, 7/10/01 WCG PR.

Williams Communications continues to project . . . becoming free cash flow positive by year-end 2003 and the company now expects to be funded into 2004.

¶ 102, 8/1/01 WCG PR.

WCG's current financing plan is expected to fund the cash requirements under its current business plan into 2004, consistent with its business objectives of becoming free cash flow positive by year-end 2003. In addition, WCG believes that its business plan provides a path for compliance with its covenant requirement throughout this period as well.

¶ 103, 8/10/01 Form 10–Q.

With a funding that takes us into 2004, a plan to be free cash-flow positive by the end of 2003, and the right team and strategy in place, we are positioned to not only survive the current shakeout, but thrive in the years to come.

¶ 106, 8/15/01 WCG PR.

Janzen said the sale and lease-back of the Williams Technology Center "is one more step in the successful execution of our financing plan and reaffirms Williams Communications' commitment to deliver on its promises."

¶ 109, 9/17/01 WCG PR.

[WCG] has met all covenant requirements under its bank credit facility and publicly traded bonds for the third quarter of 2001 . . . "We continue to execute

on our financing plan," said Scott Schubert, chief financial officer of Williams Communications Group. "We are committed to delivering on our promises, including meeting our covenant requirements."

¶ 111, 10/1/01 WCG PR.

With our success in executing on every part of our financing plan throughout this year, the company has a fully funded business plan and does not need to raise additional capital at this time," said Schubert.

¶ 114, 10/31/01 WCG PR. *See also,* ¶¶ 80, 90, 92, containing similar statements.

44. The Court finds that the Complaint sufficiently alleges that based on these statements, WCG investors were led to believe that the Company was sufficiently capitalized both near-term and long-term. According to the Complaint, these positive statements concerning WCG's capitalization were false and misleading when made because Defendants knew or recklessly disregarded that WCG was undercapitalized over the time frame projected, overburdened with debt, and incapable of meeting its payments and debt covenants on an ongoing basis. Furthermore, WCG's false accounting masked its poor financial condition, and the $1.4 billion guaranty by WMB was insufficient on a long-term basis to enable WCG to thrive but served merely as a stopgap. *See* ¶¶ 9, 10, 14, 60, 64, 64, 74, 81, 105, 108.

VI. The Alleged Statements are Not Protected by PSLRA's Safe Harbor Provision or the Bespeaks Caution Doctrine

45. The PSLRA provides that "a person . . . shall not be liable with respect to any forward-looking statement . . . if and to the extent that the forward-looking statement is identified as a forward-looking statement, and is accompanied by

meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u–5(c)(1)(A)(i). The common law bespeaks caution doctrine also may provide protection "when forecasts, opinions, or projections in a disclosure statement · are accompanied by meaningful warnings and cautionary language" that warn investors of exactly the risk that Plaintiffs claim was not disclosed. *Harden v. Raffensperger*, 65 F.3d 1392, 1404–1406 (7th Cir.1995) (discussing the bespeaks caution doctrine and holding that it is a narrow defense that only applies to statements concerning the future).

46. The Court finds that the alleged false and misleading financial results are not subject to either the PSLRA's safe harbor or the bespeaks caution doctrine because they concerned the Company's then-existing financial condition and/or cannot be construed as "forward-looking."

47. The Court further finds that the alleged statements concerning the reasons for WCG's spin-off, WCG's business condition and prospects, and WCG's capitalization are not protected by the safe harbor or the bespeaks caution doctrine for the reasons set forth below.

48. First, many of these alleged statements, including statements concerning growing demand and lack of bandwidth glut, are simply not forward-looking but rather are statements of historical or then-existing conditions. In addition, none of the statements concerning WCG's capitalization, such as that WCG was fully funded in 2003 and 2004 and did not need to raise additional · capital, are protected by the PSLRA's safe harbor provision because the majority of these statements are not truly "forward-looking" but, rather, are statements of present fact. *See No. 84 Employer–Teamster Joint Council Pen-*

*sion Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 936–37, (9th Cir.2003) (holding that statements "the settlement agreement's provisions will not have a material adverse affect on the Company's operations or financial results" and "[w]e are not anticipating any major increase in maintenance costs or the cost of oversights going forward as a result of [the settlement agreement]" are not forward-looking). To allow statements of this type to be shielded by the safe harbor would mean that "any corporation could shield itself from future exposure for past misconduct by making present-tense statements regarding the misconduct and its effects on the corporation. Such blanket protection would eviscerate the 1934 Act altogether." *Id.*

49. Second, even as to those statements that could be considered forward-looking, for cautionary language to be effective, the forward-looking, statement must be "accompanied" by "sufficiently specific risk disclosures or other cautionary statements concerning the subject matter of the statements at issue to nullify any potentially misleading effect." *Grossman*, 120 F.3d at 1120. Here, the purported cautionary language fails to meet these exacting standards. In particular, the purported warnings contained in WCG's September 30, 1999 IPO prospectus and its May 12, 2000 Form 10–Q— issued ten months and two months, respectively, prior to the start of the Class Period—do not apply because they did not "accompany" the alleged false statements pursuant to the PSLRA and were too remote to imply any caution. 15 U.S.C. § 78u–5(c)(1)(A)(i); *Grossman*, 120 F.3d at 1123 ("remote cautions are less likely effectively to qualify predictions contained in separate documents"); *Sprint*, 232 F.Supp.2d at 1222 (risk disclosures in Joint Proxy issued about seven weeks prior to

alleged statements did not sufficiently nullify the misleading effect, as the time lapse weighed against operation of the bespeaks caution doctrine and the safe harbor). Further, many of the documents containing the alleged statements did not refer at all to any potentially applicable cautionary language (*see, e.g.,* ¶¶ 68, 88, 98, 127, 133), and even those which referred to other documents for cautionary language, did not refer to specific SEC filings or the specific sections of those voluminous filings, much less identify any specific warnings or disclosures contained therein as pertaining to the alleged statements.

50. In addition, as alleged in the Complaint, Defendants' warnings were simply not enough in light of what Defendants knew at the time they made their false statements or the information to which they had access. Defendants contend that they disclosed, for example, the Company's assets, liabilities, cash requirements and expenditures, and funding needs, and warned that delays in provisioning and delivering network services would adversely impact its operations through 2001, that operating losses attributable to its Solutions Unit would adversely affect its financial results in 2000, that "[i]ncreased competition could lead to price reductions", and that "if prices for network services decline, we may experience decline in revenues." However, Plaintiffs allege in the Complaint that Defendants' statements during the Class Period were either made in light of adverse information known to them or specifically designed to downplay those risks. For example, as alleged in the Complaint, Defendants' disclosed information does not affect the falsity of Defendants' stated reasons for the spin-off— namely, to allow WCG effective and efficient access to capital and to allow it to pursue growth opportunities—when in fact the spin-off was to enable WMB to rid itself of WCG and transfer its problems to others. Also, Defendants' warnings about potential declines in revenues and decline in prices are insufficient where the Company was already experiencing significant declines but was nevertheless assuring investors that there was no bandwidth glut and that WCG was thriving on others' misfortunes. Further, Defendants' disclosures are insufficient to warn of lack of capitalization where Defendants repeatedly affirmed that the Company was adequately funded into 2003 or 2004, even though Defendants were aware of the falsity of their statements because they had been told by their advisors that WCG's access to capital markets had dried up, engaged in specific transactions designed to load up WCG with over $7 billion in debt prior to the spin-off, knew WCG was in danger of breaching debt covenants on numerous occasions, were notified by certain creditors that WCG was in breach of debt covenants, were cutting essential expenditures and staff, held meetings to discuss the ongoing viability of the Company, and hired outside advisors that specialized in distressed companies and restructuring in bankruptcy. The generic warnings of problems that can affect the Company's revenues are insufficient because Defendants failed to disclose that these problems had already manifested themselves and were severely and adversely impacting the Company's viability. Indeed, Defendants cannot be insulated from liability when they continued to make highly positive statements even as they took steps outside of public view in preparation for WCG's impending bankruptcy. The fact that Defendants refuted any intention to seek bankruptcy and then repudiated it about two weeks later indicates the possible presence of deception that simply cannot be nullified by cautionary statements. *See Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1097, 111 S.Ct. 2749, 115

L.Ed.2d 929 (1991) ("not every mixture with the true will neutralize the deceptive"); *Mayer v. Mylod,* 988 F.2d 635, 639 (6th Cir.1993) (same); *In re Prudential Sec. Ltd. Ptnrshps. Litig.,* 930 F.Supp. 68, 74 (S.D.N.Y.1996) ("Warnings of possible detriment are insufficient if they are simply a smoke screen to cover a company's internal reasonably informed certainty of detriment"); *In re Convergent Technologies Sec. Litig.,* 948 F.2d 507, 515 (9th Cir.1991) (it is misleading to present a risk as merely a contingency after the risk has materialized); *Sprint,* 232 F.Supp.2d at 1222 ("the inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to reveal known material, adverse facts"), citing *Rubinstein v. Collins,* 20 F.3d 160, 171 (5th Cir.1994) and *Gabriel Capital, L.P. v. NatWest Fin., Inc.,* 122 F.Supp.2d 407, 419 (S.D.N.Y. 2000) ("The 'bespeaks caution' doctrine ... does not apply where a defendant knew that its statement was false when made.")

## VII. The Complaint Adequately Alleges Scienter

51. The PSLRA requires that plaintiffs plead facts "giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The appropriate level of scienter is, " 'a mental state embracing intent to deceive, manipulate, or defraud,' " which includes recklessness. *Fleming,* 264 F.3d at 1259 (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. at 193 n. 12, 96 S.Ct. 1375). When determining whether plaintiffs have pled facts giving rise to a strong inference of scienter, the Tenth Circuit has adopted the First and Sixth circuit's interpretation of the PSLRA's scienter as set forth in *Greebel,* 194 F.3d at 196, and *Helwig,* 251 F.3d at 540, respectively. Under this interpretation, courts are to examine plaintiffs' allegations "in their entirety," including any

allegations of motive and opportunity, in order to determine whether Plaintiffs have sufficiently alleged knowing or reckless conduct on the part of defendants. *Fleming,* 264 F.3d at 1263.

52. "Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful non-disclosures alleged." *Id.* at 1261 (citing *Novak v. Kasaks,* 216 F.3d at 307). Accordingly, allegations that Defendants could (and would) have reaped material benefits as a result of their fraud are probative of scienter, even if their alleged scheme was aborted prior to its ultimate fulfilment. *See Fla. State Bd. of Admin. v. Green Tree Fin. Corp.,* 270 F.3d 645, 662 (8th Cir.2001) ("The ultimate profitability of a course of conduct is not conclusive of intent. Just as we cannot countenance pleading fraud by hindsight, neither can we infer innocence by hindsight because the alleged misdeeds did not pay off").

53. In *Helwig,* the Sixth Circuit held that allegations sufficient to support an inference of scienter include, among other things, (a) "divergence between internal reports and external statements on the same subject"; (b) "closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information"; (c) "disregard of the most current factual information before making statements"; (d) "disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication"; and (e) "the self-interested motivation of defendants in the form of saving their salaries or jobs." *Helwig,* 251 F.3d at 552 (citing *Greebel,* 194 F.3d at 196). The Complaint, when viewed in its totality, contains allegations that satisfy each of these factors.

54. As discussed in more detail below, the Complaint sufficiently alleges a

scheme whereby WMB was able to spin-off its underperforming subsidiary with a large debt load which WMB would otherwise have been responsible for, structure subsequent transactions so as to artificially make WMB the Company's largest creditor in bankruptcy, and then attempt to emerge from the bankruptcy with a majority interest in the new WCG, at the expense of WCG's former shareholders. The fact that this scheme ultimately partially failed in the bankruptcy courts, still leaving WMB free of any debts owed by WCG, but not allowing it a majority holding in the new WCG, does not make Plaintiffs' motive and opportunity allegations any less significant.

55. The Complaint also alleges additional motives for Defendants' behavior apart from the overall scheme allegations. First, the Complaint alleges that Defendants had a strong motive to misrepresent WCG's financial statements because WCG's continued viability was dependent upon certain measures of WCG's financial performance, including the Company's EBITDA, revenues and asset values, which were directly linked to WCG's debt and bank covenants. ¶ 221. *See In re Cabletron Systems, Inc.*, 311 F.3d 11, 39 (1st Cir.2002) (finding sufficient motive where "the executives' careers and the very survival of the company were on the line"); *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 425 (5th Cir.2001) (scienter for misstatements about patent supported by fact that company's future depended on the patent). Second, the Complaint alleges that the Individual Defendants were motivated to help WMB spin-off WCG and, thereafter, to continue promoting WCG in order to prevent negatively impacting WMB's balance sheet as long as possible because prior to their positions with WCG, numerous Individual Defendants held senior positions with WMB, including Defendants Janzen, Kinnear, McCoy, Bumgarner and Semple, and many of the Individual Defendants had been momentarily indebted to WMB. ¶ 221. Thus, the Individual Defendants had a strong motive to do WMB's bidding[6]. In fact, significant bonuses were paid for 2001 as a reward for completing the spin-off. ¶¶ 135, 144.

56. Furthermore, plaintiffs do not simply allege motive and opportunity, but also allege specific instances of intentional or reckless deception.

57. In pleading scienter, "the important issue [ ] is not whether Defendants knew the underlying facts, but whether Defendants knew that not disclosing the [underlying facts] posed substantial likelihood of misleading a reasonable investor." *Fleming*, 264 F.3d at 1264 (*citing Schlifke v. Seafirst Corp.*, 866 F.2d 935, 946 (7th Cir.1989) ("It is the danger of misleading buyers that must be actually known or so obvious that any reasonable man would be legally bound as knowing"); *Sundstrand*

---

6. A Corporation's motives can be attributed to individual defendants. *See, e.g., Howard v. Everex Sys., Inc. Sec. Litig.*, 228 F.3d 1057, 1064 (9th Cir.2000) (finding that CEO of company potentially had motive to inflate sales in order to raise financing for company); *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 269–270 (2nd Cir.1993) (officers and directors were alleged to have sought to artificially inflate the company's stock price in order to enable the company to lessen the dilutive effect of a planned offering of securities by Time Warner), *cert. denied*, 511 U.S. 1017, 114 S.Ct. 1397, 128 L.Ed.2d 70 (1994); *In re Resource America Sec. Litig.*, No. 98–5446, 2000 WL 1053861, *7, 2000 U.S. Dist. LEXIS 10640, *22 (E.D.Pa. July 26, 2000) (finding strong inference of scienter where complaint alleged that *all* of the defendants, including the individual defendants who did not individually engage in insider trading, were motivated to commit fraud in order to complete a $112 million public stock offering).

*Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1045 (7th Cir.1977) ("[the] danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it ...")).

58. The Complaint contains allegations that constitute legally sufficient circumstantial evidence of Defendants' conscious misbehavior and/or recklessness by establishing that Defendants knew facts and/or recklessly disregarded information at their disposal contradicting their positive public statements which they knew and/or recklessly disregarded would likely mislead investors. *Fleming,* 264 F.3d at 1261. The Complaint alleges that WCG's problems, described in detail throughout this order, were so large, pervasive and fundamental, that their existence must have been known to Defendants, the most senior members of WCG's day-to-day management, and specifically alleges the case-specific reasons why each of the Defendants, in their positions, would have been aware of the adverse information: (a) Defendants Janzen, Schubert, and Bailey all utilized divisional reports prepared on a monthly basis that reported actual business performance data for WCG's various divisions, in conference calls with WCG employees. ¶ 223; (b) Defendant Bailey was Chairman of WCG until the spin-off in April 2001 and was responsible for the spin-off of WCG. ¶ 218; (c) Defendant Janzen was WCG's CEO, President and a director and had the responsibility to assure himself that the statements made by WCG, including but not limited to press releases and financial disclosures, were true and not misleading. Defendant Janzen was, at all relevant times, aware of the financial status of WCG through his attendance at monthly "Cabinet Meetings" and weekly finance meetings at which "near real time" performance data was presented. ¶ 225; (d) Defendant Schubert, WCG's CFO, and Defendant Kinnear, WCG's Chief Accounting Officer, were the persons at WCG charged with direct oversight over its accounting practices and procedures. Defendants Schubert and Kinnear were, at all relevant times, aware of the financial status of WCG through their attendance at monthly "Cabinet Meetings" and weekly finance meetings at which "near real time" performance data was presented. ¶ 228; (e) Defendant Kalika was WCG's Vice President and Group Executive for Finance and Treasury and was responsible for supervision of WCG's Risk Management. Moreover, Defendant Kalika was involved in negotiations and discussions with WCG's financial lenders, and was aware that, at all relevant times, WCG was on the verge of violating, and in fact did violate, financial covenants with WCG's lenders. *Id.* Defendant Kalika was also involved in all aspects of the spin-off of WCG by WMB, and signed the April 23, 2001 Separation Agreement. ¶ 230; (f) Defendant Bross was WCG's Senior Vice President Chief Technology Officer, and was responsible for purchasing equipment for WCG's network. Defendant Bross routinely ignored the recommendations of his engineers and testing lab as to the needs of WCG, and instead, made commitments to purchase products from vendors which provided "friends & family" deals to Bross and his associates. ¶ 233; (g) Defendant McCoy was WCG's General Counsel and was responsible for the legal documents and SEC filings of WCG. ¶ 231; (h) Defendant Bumgarner, was WCG's Senior Vice President responsible for strategic investments and a director of WCG and was also personally involved in numerous friends and family deals. ¶ 233; and (i) Defendant Semple was President of the Network and COO and was responsible for overseeing problems on WCG's network. ¶ 232.

59. This Court finds that the Complaint alleges both sufficient motive and opportunity for Defendants to have committed fraud, as well as specific alleged reasons why the Individual Defendants would have had knowledge of, or access to, the facts adverse to their public statements. Under the totality of the circumstances test, this Court finds that the combination of the two sufficiently pled the required strong inference of scienter.

### VIII. WMB's Alleged Violation of the Federal Securities Laws

■ 60. The Complaint sufficiently alleges that prior to the spin-off of WCG, WMB owned 86% of WCG and was in legal control of WCG. WMB, therefore, may be held liable under § 10(b) and Rule 10b–5 for the alleged false statements made prior to WCG's spin-off.[7]

61. Following the spin-off of WCG, based on the allegations in the Complaint, WMB's liability also lies for several reasons. First, it is primarily liable under § 10(b) and Rule 10b–5 because: (a) it misleadingly failed to recognize or reserve on its books the billions of dollars in contingent liabilities of WCG which it had guaranteed prior to the spin-off; and (b) it participated in the scheme to defraud by spinning off WCG in order to avoid serious damage to its own financial condition and then later contrived to regain WCG, debt-free. Second, WMB is liable as a controlling person under § 20(a) for WCG's statements made both before and after the spin-off.

### A. WMB's Contingent Liabilities With Respect to WCG

62. The Complaint alleges with sufficient particularity that WMB's failure to reserve on its books the billions of dollars in contingent liabilities of WCG had the effect of artificially inflating WCG's securities prices because the market, relying on WMB's false financial statements, was led to believe that WCG was adequately capitalized. ¶¶ 6, 12, 95–97,126. Because WMB's false financial statements defrauded the market, and WCG's investors bought their securities "in connection with" such statements, WMB may be held liable to WCG investors. *See infra.* Even as of January 29, 2001, when WMB announced a "reassessment" of its contingent liabilities with respect to WCG, this announcement was false and misleading because, as pleaded in the Complaint, WMB knew or recklessly disregarded that WCG's financial condition was so precarious that it was all but certain that WMB would have to perform on the guaranty; WMB by that time should have indicated it needed to book the liability on its financial statements. ¶ 126. Had WMB reserved the contingent liabilities of WCG on its books during the Class Period, this would have caused WCG's stock price to plummet as it would have signaled to the market the financial instability and undercapitalization of WCG; by not recording the liability on its books, the Complaint alleges that WMB defrauded both WMB's and WCG's investors. *See Semerenko v. Cendant Corp.,* 223 F.3d 165 (3rd Cir.2000); *Muzinich & Co. v. Raytheon,* No. CV–01–284–S BLW, slip op. (D.Idaho, May 1, 2002) (upholding the right to sue by WGI investors who acquired their shares "in connection" with Raytheon's fraud because when Raytheon sold its subsidiary to WGI, its subsidiary's revenues were false); *In re*

---

7. These alleged statements include statements about the reasons for the spin-off (¶¶ 59, 65, 75), the financial results of WCG, which were disseminated in press releases and in WCG's Form 10–Qs and WCG's and WMB's Form 10–Ks (¶¶ 61, 63, 70, 260–261), statements concerning the business condition and prospects of WCG (¶¶ 61, 62, 67, 68), and statements concerning WCG's capitalization (¶¶ 73, 78, 80).

*National Golf Properties, Inc. Sec. Litig.,* No. CV 02–1383–GHK(RZx), 2003 WL 23018761, 2003 U.S. Dist. LEXIS 4321 (C.D.Cal. Mar. 18, 2003) (finding that American Golf could be held liable under § 10(b) to National Golf investors where plaintiffs alleged American Golf made false statements or omissions in its financial statements that were incorporated in National Golf's prospectus).

### B. *Scheme to Defraud*

63. Based on the allegations in the Complaint, WMB also has primary liability for all of the alleged statements because it participated in the scheme to defraud. Section 10(b) and Rule 10b–5 are intended to be read "flexibly, not technically and restrictively." *SEC v. Zandford,* 535 U.S. 813, 821, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002). *In re Enron Corp. Sec. Litig.,* 235 F.Supp.2d 549 (S.D.Tex.2002), the court recognized that securities fraud actions under § 10(b) and Rule 10b–5 are not merely limited to the making of an untrue statement of material fact or omission to state a material fact. Section 10(b) also prohibits "any manipulative or deceptive contrivance," which includes "a scheme to deceive." *Id.* at 577. *Accord, Steinbeck v. Sonic Innovations,* No. 2:00–CV–00848PGC, 2003 U.S. Dist. LEXIS 2378, *24 (D.Utah Feb. 11, 2003).

64. Here, the Court finds that the Complaint sufficiently alleges a scheme whereby WMB spun-off WCG in order to unload debt and avoid damage to WMB's financial statements, credit rating, and on-going solvency. When disclosure of information as to WCG's impaired state could no longer be avoided, WMB engaged in transactions designed to allow it to become WCG's largest creditor, control WCG's bankruptcy, avoid having to pay on its loan guarantees of over $2 billion, and to emerge from the transactions with control

of WCG's assets, virtually debt-free, at the expense of WCG's common shareholders. Under these circumstances, the alleged self-dealing and the back-door transactions between WCG and WMB sufficiently plead a "scheme to defraud."

### C. *Control Person Liability*

65. As to the alleged false statements made both before and after WCG was spun-off, WMB is also liable for them as a control person under § 20(a) of the 1934 Act. Section 20(a) provides:

> Every person who, directly or indirectly controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to whom such controlled person is liable.

15 U.S.C. § 78t. "[Section 20(4) ] is remedial and is to be construed liberally. It has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable." *Maher v. Durango Metals,* 144 F.3d 1302, 1305 (10th Cir.1998), citing *Richardson v. MacArthur,* 451 F.2d 35 (10th Cir.1971). Moreover, control person determination is a factual question not ordinarily subject to resolution on a motion to dismiss. *Id.* at 1306.

66. Here, the Complaint sufficiently alleges that WMB had some direct or indirect influence over WCG. For example, WCG and WCG's officers remained under the "control" of WMB even after the spin-off due to their interlocking relationships, the numerous and continuing financial transactions between WMB and WCG, and the fact that WMB exerted its domination and control over WCG as demonstrated by its actions prior to WCG's bankruptcy. Indeed, many of the same officers of WCG

prior to the spin-off remained as officers of WCG even after the spin-off. Many of these WCG officers had long tenures with WMB, including Defendants Janzen, Kinnear, McCoy, Semple, and Bumgarner. ¶ 221. Furthermore, prior to the spin-off, many of these WCG officers allegedly owed large debts to WMB, with Defendants Janzen owing $3.9 million, Schubert owing $4 million, Bumgarner owing $6.9 million, McCarthy owing $5 million, and Semple owing $1.1 million to WMB, as of February 15, 2001. ¶ 221. Additionally, as of January 31, 2001, many of these officers, including Defendants Janzen, Bumgarner, and Semple, owned tens of thousands more WMB shares than they did of WCG shares. ¶ 221. Although Defendants have brought to Plaintiffs' attention that, according to WCG's 2001 Form 10–K, WCG officers' debts to WMB became assigned to WCG at the time of the spin-off (Defs' Ex. 51, at F–74), and that certain of WCG Defendants' shares were converted to WMB shares at the time of the spin-off (Defs' Ex. 51, at III–5, n. 6), this does not change the fact that WCG's officers were beholden to WMB prior to the spin-off and likely stayed loyal to it after the spin-off. ¶ 221. In the same 2001 Form 10–K relied on by Defendants, it appears that WMB's ties to WCG were not severed even after the spin-off because WMB paid for one of WCG's officers' salaries.

67. Furthermore, WMB's actions during the Class Period, as alleged in the Complaint, indicate that it participated in WCG's operations and controlled WCG even after the spin-off. These alleged actions also establish scienter. For example, on January 29, 2002, when WCG was informed by its bankers that it may be in default of its credit agreement, WCG did not publicly disclose this fact. However, it appears that WCG may have privately provided real-time information to WMB because, that same day, WMB issued a press release announcing that it would be delaying the release of its 2001 earnings "pending an internal assessment" of its "contingent obligations" to WCG. ¶ 129. Also, on April 22, 2002, when WCG filed for bankruptcy, even before WCG made a public announcement about its bankruptcy filing, WMB issued a press release announcing that WCG was going bankrupt. ¶ 149.

68. Additionally, WMB's control is evidenced by the fact that it was able to position itself to become WCG's largest creditor prior to WCG's bankruptcy. After WCG was informed by its banks that it may be in default of its credit agreement (¶ 125), and after WCG's Compensation Committee approved loan forgiveness or "retention bonuses" of $13 million to its top officers, which would be acclerated upon WCG's bankruptcy (¶ 135), on February 23, 2002, unknown to the public, WMB and WCG privately entered into an agreement whereby WMB arranged to provide the treatment of its unsecured claims in a manner substantially identical to the claims of WCG's senior redeemable notes holders and to not impair its claims arising from certain service agreements and sale and leaseback agreements. ¶ 136. Shortly, after WCG and WMB entered into this agreement, on March 5, 2002, WMB assumed the interest payments on WCG's $1.4 billion debt. ¶ 141. Three days later, on March 8, 2002, WCG and WMB entered into an agreement regarding ADP assets, whereby WCG exercised its options to purchase these assets and WMB was obligated to fund the price for these assets. As soon as the ADP transaction closed on March 29, 2002, when WCG tendered an unsecured note to WMB for $750 million in connection with the ADP assets (¶ 143), the next business day, on April 1, 2002, WCG announced to investors that there would be an impairment charge of $2.9 billion to its fourth quarter 2001, causing

WCG to suffer a net loss of $3.8 billion in FY2001, and driving it into bankruptcy. ¶ 145. By that time, WMB had become WCG's largest creditor and was in a position to control WCG's bankruptcy by (i) assuming $1.4 billion in WCG debt; (ii) the sale and leaseback of WCG's headquarters; (iii) receiving a note from WCG for $750 million after transferring ownership of ADP assets to WCG; and (iv) controlling CG Investments, a subsidiary of WCG, which purchased and held $550 million of WCG's senior redeemable notes during the Class Period. ¶¶ 24, 148. Under terms of the initial bankruptcy plan, WMB stood to regain half of WCG, debt-free, while WCG shareholders stood to receive nothing in the bankruptcy. ¶ 150.

### IX. E & Y's Potential Liability for Alleged Violations of the Federal Securities Laws

A. *Plaintiffs' Claims Under Section 10(b) of the Exchange Act*

E & Y moves the Court to dismiss Plaintiffs' claims pursuant to Section 10(b) of the Exchange Act on the following grounds: (1) E & Y cannot be held liable under Section 10(b) for statements contained in WCG Form 10–Qs, press releases, and other public statements; and (2) the Complaint fails to plead E & Y's alleged violations of the securities laws with particularity. The Court will address each of these claims in turn below.

1. *Whether Ernst & Young May be Held Liable for Statements It Did Not Make*

■ 69. E & Y argues that it cannot be held liable for statements in 10–Qs, press releases, and other public statements which are not attributable to E & Y. Prior to 1994, defendants could be found liable under Section 10(b) for aiding and abetting others in violation of Section 10(b). However, in *Central Bank of Denver*, the Supreme Court determined that the statute

should be interpreted to prohibit "only the making of a material misstatement (or omission) or the commission of a manipulative act." *Id.* The result of this decision is that only primary violators can be held liable under Section 10(b). *Id.* Therefore, to bring a claim under Section 10(b), a plaintiff must now establish that a defendant is a primary violator.

■ 70. In *Anixter*, the Tenth Circuit set forth the requirements for primary violator liability under Section 10(b):

(1) that the defendant made an untrue statement of material fact, or failed to state a material fact; (2) that the conduct occurred in connection with the sale of a security; (3) that the defendant made the statement or omission with scienter; and (4) that plaintiff relied on the misrepresentation, and sustained damages as a proximate result of the misrepresentation.

*Anixter*, 77 F.3d at 1225. The Tenth Circuit has made clear that, to be held liable under Section 10(b), accountants "must themselves make a false or misleading statement (or omission) that they know or should know will reach potential investors." *Id.* at 1226. An analysis of the allegations against E & Y reveals that the Complaint fails to satisfy *Anixter*'s four requirements with regard to the 10–Qs, press releases, and other public statements made by WCG. The Court finds that, despite Plaintiffs' claims to the contrary, Plaintiffs have failed to allege facts supporting primary violator liability against E & Y for those statements. Accordingly, Plaintiffs' claims against E & Y are hereby dismissed to the extent they are premised on WCG's 10–Qs, press releases, and other public statements not made by E & Y.

2. *Whether the Complaint Sufficiently Alleges Facts Establishing a Strong Inference of Scienter*

71. Applying the analysis set forth above with respect to the scienter pleading

requirements of Fed.R.Civ.P. 9(b) and the PSLRA, the Court finds that the Complaint sufficiently sets forth allegations to establish scienter. Specifically, the Court finds that Plaintiffs have alleged that "(1) [this] defendant knew of the potentially material fact, and (2) [this] defendant knew that failure to reveal the potentially material fact would likely mislead investors." *See Fleming,* 264 F.3d at 1261. As discussed above, the knowledge requirement can be satisfied under a reckless standard. *Id.* With respect to an account defendant, allegations of General Accepted Accounting Principles ("GAAP") and General Accepted Accounting Standards ("GAAS") violations, coupled with other allegations which suggest fraudulent intent are adequate to support an inference of scienter. *Id. See also, Anixter,* 77 F.3d at 1226; *In re Westinghouse Sec. Litig.,* 90 F.3d 696 (3d Cir.1996).

▮ 72. The Court finds Plaintiffs have sufficiently pled allegations establishing a strong inference of scienter as required by *Fleming.* The Complaint sets forth allegations which draw into question E & Y's motive and independence based on its significant consulting fees from WCG. Also, Plaintiffs point out and question how E & Y could not have been aware of alleged misstatements and omissions with regard to WCG's financial statements based on the high level of interaction between WCG and E & Y during the Class Period. Specific allegations of GAAP and GAAS violations are also set forth in the Complaint.

73. The Court further finds that the Complaint sufficiently alleges that E & Y participated in Defendants' scheme to mislead purchasers of WCG securities by, among other things, issuing a "clean" audit opinion for WMB and WCG's year-end 2000 (¶¶ 260–261), assisting WCG in preparing the Company's quarterly reports (¶ 46, 263), and failing to properly and timely cause recognition of WMB's $1.4 billion contingent guaranty of WCG on WMB's books and/or take appropriate reserves (¶¶ 12, 20 n.3, 263).

74. The Court further finds that the Complaint contains sufficient allegations to raise a strong inference that E & Y either knowingly and/or recklessly misrepresented that WCG's financial statements were in accordance with GAAP and its audits were conducted in conformity with GAAS. Furthermore, the Court finds that E & Y's involvement in WCG's and WMB's quarterly financial reports acted as a fraud and/or artifice on purchasers of WCG securities. As detailed below, the Complaint identifies numerous factors supporting E & Y's scienter, including: (a) E & Y's failure to follow GAAS and disclose GAAP violations (which led to huge misstatements of WCG's financial statements); (b) E & Y's disregard of "red flags" and failure to investigate WCG's suspect accounting practices, including WCG's IRU transactions and asset write-downs; (c) the magnitude of the fraud; (d) the powerful economic motives for E & Y to participate in or facilitate the fraud; and (e) E & Y's intimate knowledge of WCG's operations.

75. "[D]eliberately ignoring 'red flags' . . . can constitute the sort of recklessness necessary to support a § 10(b) violation." *Great Neck Capital Appreciation Inv. P'ship, L.L.P. v. PricewaterhouseCoopers, LLC,* 137 F.Supp.2d 1114, 1124 (E.D.Wis. 2001). An accountant's disregard of "red flags" suggests that its violation of GAAS "must have resulted from a conscious decision to do so or from severe recklessness on [its] part." *In re MicroStrategy, Inc. Sec. Litig.,* 115 F.Supp.2d 620, 654 (E.D.Va.2000).

76. Here, the April 27, 2000, article in the industry publication *Light Reading* concerning Defendants' lucrative friends

and family deals constituted a red flag, and as such should have prompted an investigation by E & Y into WCG's inventory practices, including the value of that inventory. ¶ 247.

77. Moreover, WCG's large build-up of inventory between 2000 and 2001 was at odds with the amount of equipment needed to complete WCG's already substantially built-out network. Additionally, WCG's loss of major customers, combined with steadily declining prices in the bandwidth industry, should have caused E & Y to update its valuation of WCG's assets. Furthermore, based on the allegations in the Complaint, E & Y knew and/or recklessly disregarded that, but for the improper recognition of revenues and failure to write-down its impaired assets, WCG would be in default of its agreements for its credit and debt facilities. E & Y was also involved in structuring WCG's improper IRU transactions engaged in merely to prop-up WCG's revenues and which were inadequately disclosed to the public. Finally, because E & Y audited both WCG and WMB, E & Y was aware that WMB was required to book its $1.4 billion WCG contingent guaranty on its books, evidencing WCG's inability to service the debt by itself.

78. Despite these numerous "red flags" and warning signs that the financial reports were misstated, E & Y approved WCG's financial statements that were riddled with GAAP violations. ¶ 247–254. Performing the audit required E & Y to closely review WCG's IRU transactions to determine whether they resulted in improper revenue recognition. E & Y was also required to test the values of WCG's assets. If E & Y failed to do so, its conduct amounted to an " 'egregious refusal to see the obvious, or to investigate the doubtful,' " establishing scienter. *Chill v. GE Co.*, 101 F.3d 263, 269 (2d Cir.1996).

79. Additionally, the enormity of the alleged fraud suggests that E & Y knew about WCG's fraud but chose to look the other way. *See United States v. Weiner*, 578 F.2d 757, 778 (9th Cir.1978). Here, the magnitude of the alleged accounting fraud, including an asset write-down of $2.9 billion, as well as $2 billion in IRU/ swap transactions, support a strong inference of E & Y's scienter, Further, the magnitude of WMB's failure to recognize WCG's $1.4 billion contingent guaranty on its books also speaks for itself.

80. Moreover, E & Y's substantial consulting and non-audit work at WCG and WMB provided E & Y with special insight into WCG's inner-workings. ¶ 237. Further, as a result of the comprehensive services that E & Y provided to WCG, and E & Y's continuous · physical presence at WCG's headquarters, E & Y was intimately familiar with WCG's business, including its use of IRUs and the value of WCG's assets. Because WMB was also its audit client, E & Y was aware that WMB was required to reflect the $1.4 billion WCG guaranty on its books and/or take appropriate reserves. The allegations that E & Y had a deep understanding of the existence and significance of WCG's problems sufficiently establish an inference of scienter. *See In re Sunbeam Sec. Litig.*, 89 F.Supp.2d 1326, 1346 (S.D.Fla.1999) (" 'allegations that [the auditor] had knowledge of [the company's] internal workings and had a history with the company, taken together, support a claim that the failures to observe GAAS in this particular audit amount to a level of recklessness high enough to maintain an action under § 10(b).' ")

81. Although Plaintiffs are not required to plead Defendants' motives, such allegations may be " 'relevant to pleading circumstances from which a strong inference of fraudulent scienter may be in-

ferred.'" *In re Comshare Inc. Sec. Litig.,* 183 F.3d 542, 551 (6th Cir.1999). Here, the Complaint alleges E & Y was motivated to engage in fraudulent conduct because it earned many millions of dollars from its role as auditor for WCG and WMB, as well as from its lucrative consulting and non-auditing business for WMB and WCG—for which E & Y was paid over $24 million in fiscal 2000. ¶ 240. "By violating the GAAS requirement of independence, [the auditor] has weakened its ability to rely on its reputation in countering as 'irrational' allegations that it participated in a client's fraud, for it is that very reputation that an allegation of lack of independence questions." *MicroStrategy,* 115 F.Supp.2d at 655.

82. The Court finds that these allegations satisfy the particularity requirements of Fed.R.Civ.P. 9(b) and the pleading requirements necessary to state a claim under Section 10(b) of the Securities Exchange Act, including the particularity requirements of the PSLRA. Accordingly, E & Y's motion to dismiss on this basis is hereby denied.

### CONCLUSION

For the reasons set forth above, the Court hereby finds as follows: (1) Motion to Dismiss of WCG Defendants and Brief in Support (Docket No. 189) is hereby denied; (2) Motion of Williams Defendants to Dismiss the Consolidated Amended Class Action Complaint on Behalf of Purchasers of WCG Securities (Docket No. 196) is hereby denied; (3) Defendant, Ernst & Young LLP's Motion to Dismiss Consolidated Amended Class Action Complaint for Securities Fraud on Behalf of Purchasers of Williams Communications Group, Inc. Securities (Docket No. 198) is hereby granted in part and denied in part. The motion to dismiss Section 10(b) claims as they relate to Form 10–Qs, press re-

leases, and other public statements not attributable to E & Y is granted. All remaining sections of the motion to dismiss are hereby denied.

IT IS SO ORDERED.